IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER M. WARMAN, et al.,          )
                                        )
                      Plaintiffs,       )     Civil Action 19-1224
                                        )     Magistrate Judge Dodge
        vs.                             )
                                        )
LOCAL YOKELS FUDGE, LLC, et al.,        )
                                        )
                      Defendants.       )
                                        )
                                        )

## MEMORANDUM OPINION

Plaintiffs Christopher M. Warman ("Warman"), the Trust for Family of Christopher Warman (the "Trust") and Chocolate Moonshine, LLC ("Moonshine LLC")[1] have brought this action against Defendants Local Yokels Fudge, LLC ("Local Yokels"), Christine Falvo ("Falvo"), Charles Brian Griffin ("Griffin"), Donald Konieczny ("Konieczny") and CM Chocolatier, LLC ("Chocolatier"). The Amended Complaint asserts claims of trade secret misappropriation under federal and state law, federal claims of trademark infringement and copyright infringement, and state law claims of tortious interference with contractual relations, breach of contract, unjust enrichment, civil conspiracy and defamation. All of these claims arise out of issues related to a fudge recipe.

Defendants deny Plaintiffs' allegations and have asserted counterclaims against them. These counterclaims include breach of contract, conspiracy, tortious interference with contract or prospective beneficial commercial relationship and unfair competition.

---

[1] The Amended Complaint identifies Moonshine LLC as a Pennsylvania limited liability company with a principal place of business at 1911 Leesburg Grove City Road, Suite 235, Grove City, PA 16127.

Pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 116). For the reasons that follow, their motion will be granted in part and denied in part.[2]

### I.   Procedural History

Plaintiffs commenced this action in September 2019 and subsequently filed an Amended Complaint on August 27, 2020 (ECF No. 51). Federal question jurisdiction, 28 U.S.C. §§ 1331, 1338, is invoked based on the trade secret, trademark and copyright claims, and supplemental jurisdiction is asserted over the state law claims, 28 U.S.C. § 1367(a). The Amended Complaint includes thirteen counts: trade secret misappropriation in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1831-39 ("DTSA") (Count I), and the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. §§ 5301-08 ("PUTSA") (Count II); contributory trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125 (Count III); tortious interference with contractual relations by Falvo and Local Yokels (Count IV) and by Griffin and Chocolatier (Count VI); trademark infringement (Count V); breach of contract by Chocolatier (Count VII) and Falvo (Count VIII); unjust enrichment (Count IX); civil conspiracy (Count X); defamation (Count XI); contributory copyright infringement by Falvo, Local Yokels and Konieczny (Count XII); and copyright infringement by all Defendants (Count XIII), with the last two claims based on violations of the Copyright Act, 17 U.S.C. § 501.

Defendants responded to the Amended Complaint with an Amended Answer and Counterclaims. Plaintiffs subsequently filed a partial motion to dismiss certain of these counterclaims (ECF No. 56) which was granted in part and denied in part (ECF Nos. 66, 67).

Defendants' motion for summary judgment (ECF No. 116) has been fully briefed (ECF

---

[2] Defendants' motion does not address Counts IX (unjust enrichment) or X (civil conspiracy).

Nos. 119, 132, 155).[3]

## II.    Relevant Factual Background

According to the Amended Complaint, Plaintiff Warman developed a fudge recipe which is a trade secret owned by the Trust. Warman makes fudge using this recipe and sells it under a "Chocolate Moonshine" trademark. Warman licensed the recipe to his now ex-wife, Falvo, but claims that she refused to pay royalties for the license and wrongfully gave the recipe to Local Yokels and Konieczny, who conspired to interfere with Warman's business relationships and misappropriate the trade secret. According to Plaintiffs, Warman, in his capacity as Trustee, licensed the "Chocolate Moonshine" trademark to Griffin and Chocolatier, a company owned by his son, Christopher Warman Jr. ("Warman Jr.") and Griffin. However, Plaintiffs claim that Griffin and Chocolatier subsequently infringed the trademark. Finally, Plaintiffs allege that Defendants have improperly used twelve photos depicting fudge to promote their products without authorization from the Trust, which owns the copyright to the photos.

As outlined below, the parties disagree on a significant number of facts that are relevant to the disposition of Defendants' motion for summary judgment.

---

[3] Plaintiffs filed a motion (ECF No. 123) to strike Defendants' Concise Statement of Material Facts (ECF No. 117), contending that it was excessively lengthy and included immaterial facts. Following a telephone conference with the Court, Plaintiffs' motion was denied as moot (ECF No. 127) based upon a compromise reached by the parties, who agreed that Plaintiffs would be required to respond only to those facts upon which Defendants relied in their memorandum. Defendants later filed a motion to have "unresponded or undenied statements of material fact" deemed admitted (ECF No. 139). Plaintiffs opposed this motion (ECF No. 147) and Defendants requested and were granted leave to file a reply brief. In their reply, Defendants withdrew their motion (ECF No. 152 at 3).

A.   **Facts Relating to the Trade Secret Claims**[4]

1.   Individual Components, Process and Operation of the Fudge

Defendants assert that all of the individual ingredients of the recipe and the unified process and operation of making the fudge (Defs.' App. Ex. 1)[5] are in the public domain. They claim that the ingredients and process for making fudge (Defs.' App. Ex. 7 at 46-47; Exs. 26, 29, 30, 32, 33 at 29) have been well-known for some time and are disclosed in a patent issued to another party in 1968, Patent No. 3,370,961 ("the '961 patent"). (Defs.' App. Ex. 3.) Two experts proffered by Defendants support this conclusion. (Defs.' App. Exs. 56, 58.) Warman admitted that "anybody making fudge using these ingredients doesn't mean they're using my trade secret recipe." (Defs.' App. Ex. 7 at 52.)

According to Defendants, the process required by the recipe for making fudge is either in the public domain or is based on employees' experience, knowledge, memory and skill. Thus, Defendants claim, this process does not constitute a trade secret. (Defs.' App. Ex. 1; Ex. 3; Ex. 7 at 108-13, 116-18, 122, 132, 141, 148, 157-58, 166; Ex. 10 at 39, 41-42; Ex. 19; Ex. 27 answer to Interrog. 1; Ex. 31; Ex. 32; Ex. 33 at 29; Ex. 34; Ex. 56 at 4; Ex. 58 at 3-4.)

Defendants further contend that Warman purchased the recipe he uses from another fudge maker, Annette Saucier ("Saucier"), in 1988. However, they assert, Saucier did not sell him the exclusive rights to the recipe. Rather, she taught everyone who worked for her over the years how

---

[4] Defendants' Brief refers to exhibits from their Appendix, rather than to the paragraphs in their Concise Statement. Plaintiffs have responded in a narrative fashion to various sections of the facts in Defendants' brief, without numbered paragraphs and primarily by citing to their own appendix of facts. Defendants' reply statement picks up from where the Concise Statement left off and the brief primarily cites to the paragraphs of the two Concise Statements. The Court will endeavor to cite the facts from these various sources as appropriate.

[5] In sealed documents, the parties have revealed the details of the ingredients and process at issue. For purposes of resolving the present motion, the Court will only refer to them generally.

to make fudge without requiring any of them to sign a non-compete or confidentiality agreement. (Defs.' App. Ex. 10 at 12-13, 17-19, 21, 26, 28-29, 31.) Moreover, the equipment used to make fudge is universally employed in the fudge-making industry. This includes use of a copper kettle, which was used by Saucier, and which is disclosed in the '961 patent. (Defs.' App. Ex. 3; Ex. 7 at 82; Ex. 10 at 30; Ex. 33 at 18.)

In essence, Plaintiffs dispute all of these facts. Warman testified that "the technique, the combination of the ingredients…you put all those things together, those are proprietary trade secrets." (Pls.' App. Ex. 6 at 59.) He represents that the '961 patent is an entirely different recipe than his trade secret, uses various ingredients not found in the trade secret and produces a product that is not commercially viable, has an oily, slippery texture on the palate and produces an inferior fudge. (Pls.' App. Ex. 1 ¶ 4.)

According to Warman, "no recipe has ever been published that is the same as, or even substantially similar to, the trade secret." He claims that he made significant changes to the recipe he bought from Saucier, which he has not used since 1989, and that "although the product produced by her recipe was very good, it had many inherent flaws and was not commercially viable for national distribution." (*Id.* ¶ 5.)[6] His recipe provides him with a distinct competitive advantage as it allows him to make a highly regarded product that has achieved extraordinary commercial success. It provides a substantial competitive advantage by overcoming issues presented by variations in water vapor and moisture, atmospheric processes, barometric temperatures, heat and coolness and the effect of humidity on the finished product. (*Id.* ¶¶ 6-7.)

Moreover, Warman asserts, certain aspects of the fudge making process are part of the

---

[6] Defendants assert that Warman merely added a preservative to Saucier's recipe. (Defs.' Supp. App. Ex. 62, 67-69.)

trade secret process that he taught to Falvo and Konieczny. (*Id.* ¶ 8.) *See also* Pls.' App. Ex. 6 at 106-07, 126-27, 129, 135-36, 141-42, 146-47, 148 and 152-63.

Warman visited the Local Yokels facility on numerous occasions and personally observed Defendants using Warman's process. (*Id.* at 62-63.) In fact, during one of these visits, Falvo "drew [a] line in the sand" and told him that she was going to continue to use his recipe but would not pay him a royalty. He visited the facility again and watched them make batches of fudge using his recipe. (*Id.* at 64-65.)

Warman asserts that the trade secret involved in this case was previously adjudicated and upheld by the Court of Common Pleas of Allegheny County in decisions by two different judges, both of which were affirmed on appeal to the Pennsylvania Superior Court. (Pls.' App. Ex. 1 ¶ 2; Exs. 2-5.) After these cases were decided, he claims to have taken reasonable steps to protect the secrecy of the trade secret, including requiring employees to sign confidentiality agreements, restricting access to the production area, keeping ingredients out of sight, removing labels from proprietary ingredients before disposing of their containers and shipping more products to customers rather than allowing them to come to the facility. (Pls.' App. Ex. 1 ¶ 3.)

Defendants dispute the relevance of these prior lawsuits, noting that both were decided in the context of preliminary injunctions and as such, are not final rulings. According to Defendants, the evidence submitted in those cases is different from that submitted by Plaintiffs in this case. In the prior injunction actions, the court was not made aware of the existence of the '961 patent. Further, Warman has admitted that various ingredients were not unique to his recipe as he had represented in the prior cases. (Defs.' App. Ex. 7 at 49, 70-72, 97; Supp. App. Ex. 61 at 94-98; Ex. 62 at 21-23, 80.) Defendants also note that after the second of the two cases was remanded to the Court of Common Pleas for a hearing on whether Warman was entitled to recover any royalties,

the court concluded that he was not. (Defs.' Supp. App. Ex. 66.)[7]

Defendants contend that Warman admitted that if Defendants made certain changes to his recipe as they have indicated, this is not an infringement of his trade secret. (Defs.' App. Ex. 27; Ex. 35, Answer Req. Admis. 3.) In a request for admission, however, Plaintiffs were asked to admit that if Defendants were using any of the formulas, processes or recipes listed in three separate disclosures of the '961 patent, they would not be using the trade secret. Plaintiffs denied this admission, adding the following:

> Plaintiffs reiterate that it is unclear how to admit or deny a request[] that is based on  three separate disclosures in the '961 Patent each of which have varying scope, which is the reason for the denial. However, Plaintiffs admit only that if Defendants made fudge that includes [a certain ingredient, another] to be added after cooling the sugar mixture, used [a certain ingredient] in place of [another], or prepared fudge according to Example 1 or Example 2 of the '961 Patent, Defendants would not be using the Trade Secret.

Warman also testified that "if you make a slight alteration on some of the ingredients and you're still following the same process, the same blending, the same cooking techniques, then you would be using that recipe." (Pls.' App. Ex. 6 at 91.) As noted above, Plaintiffs have submitted evidence that the '961 patent is a different recipe than Warman's trade secret, uses certain ingredients that are not in the trade secret recipe and produces an inferior product. Moreover, they note, Warman testified that he saw Defendants using his fudge recipe, not those identified in the '961 patent.

2.  Knowledge of Trade Secret

Defendants contend that the alleged trade secret is known by a number of people, including:

---

[7]In addition to other inconsistencies noted by Defendants, they state that Warman provided inconsistent testimony in various lawsuits about what he learned about fudge making from Saucier. (Defs.' Supp. App. Exs. 60-64.) Determinations about the credibility of witnesses, including Warman, must be resolved at trial, not in the context of a motion for summary judgment. In addition, while Defendants cite materials to show that he paid Saucier less for her recipe than he represents he did in this case, they do not explain the relevance of this information to the merits of their motion.

Saucier and her employees; Falvo (to whom Warman gave a one-half interest in the trade secret during their marriage); Griffin (who worked for Falvo's company Fudgie Wudgie and became familiar with the recipe); Alex Weiner ("Weiner") (who purchased the personal property assets of Warman's former company, Christopher M's Hand-Made Fudge ("Christopher M's"), out of bankruptcy in 2000, was taught the recipe by Warman and Falvo and never signed a confidentiality agreement); and Shawn Sullivan ("Sullivan") (a trained candy and fudge maker who worked as a production manager at Christopher M's and did not sign a confidentiality agreement). (Defs.' App. Ex. 5 at 28-30, 69-70, 73-74; Ex. 10 at 13-14, 17-19, 51; Ex. 11 at 145-47; Ex. 13 at 35, 51-58, 62-64, 66-69; Ex. 14 at 6-7, 12-14, 19, 22, 24-27, 33-34, 47; Ex. 16 ¶¶ 2-5, 7-9, 13-16; Exs. 21-23.)

Plaintiffs dispute that any of these individuals know the trade secret, but even if some of them had certain knowledge, they were required to maintain its secrecy. For example, Warman testified that he significantly changed the recipe that he bought from Saucier. He claims to have entered into an oral licensing agreement with Weiner which required Weiner to maintain the formula as confidential until a business plan and agreement were signed. As this never occurred, the trade secret was never transferred, assigned or sold to Weiner and he was never granted a license to transfer it to others. Moreover, according to Plaintiffs, Griffin was never authorized to disclose the trade secret. Falvo never became an unconditional part owner of the trade secret because it is owned by the Trust, and as Trustee, Warman has consistently maintained control over who may permissibly use it.[8] The trade secret was never listed as an asset of Fudgie Wudgie or any other entity and Fudgie Wudgie only had the right to use the trade secret to the extent

---

[8] Thus, Defendants' contention in the reply that Plaintiffs have not denied or disputed the statements regarding Falvo is inaccurate.

authorized by Warman. Finally, with respect to Sullivan, Warman asserts that they had an understanding that Sullivan would maintain the trade secret in confidence; thus, to the extent Sullivan now claims that the formula is not a trade secret, this is contrary to his conduct while he worked for Warman. (Pls.' App. Ex. 1 ¶ 9.)

      B.   <u>**Facts Relating to the Trademark Claims**</u>

Defendants contend that the Chocolate Moonshine Co. trademark was procured by a conspiracy to commit fraud on the United States Patent and Trademark Office ("PTO") and Defendant Griffin.

On July 23, 2014, Warman Jr. filed for and subsequently obtained a trademark for "Chocolate Moonshine Co.," at Registration No. 4734457[9] pursuant to which he represented that he was the owner of it. (Defs.' App. Ex. 39.)[10]  However, the owner of the trademark was Warman (Defs.' App. Ex. 9 at 53:25-54-14), who gave his son permission to use the trademark. (*Id.* at 28; Defs.' App. Ex. 8 at 81.) Warman claims that the reason the trademark was filed in his son's name was because they were trying to protect it from Falvo. (Pls.' App. Ex. 7 at 81.) Warman testified that his son was "in shock that [Falvo] would renege on the Fudgetopia name that I had invested an enormous amount of money in, packaging, and having major success with that, and when he found out that she reneged on that and I had to create another name, he said, 'You've got to watch her' and 'I'm going to go ahead and trademark [Chocolate Moonshine].'" (*Id.* at 88.)  According to Warman, who was the "owner and manager" of Chocolate Moonshine, LLC (ECF 51 ¶ 3), "I owned the trademark. I created the trademark. I paid for the graphics for the trademark to be done.

_____

[9] The Court takes judicial notice of the registration number as reflected in the public online data base of the United States Patent and Trademark Office. *See* https://www.uspto.gov/trademarks (last visited Dec. 27, 2022).
[10] The Amended Complaint refers to the trademark as "Chocolate Moonshine."

And because of the thievery from Christine and the knives that were being put in my back from her shenanigans with Conde and Stubbs, [Warman Jr.] and I had a meeting and I said, "Chris," I said, "when we apply for the trademark, we're going to keep it under your name as a placeholder until this stuff is behind us." (Defs.' App. Ex. 8 at 81.)

Several years later, in April 2017, Griffin and Warman Jr. organized Chocolatier by entering into a Limited Liability Company Agreement of CM Chocolatier, LLC (the "Operating Agreement.") The Operating Agreement provided in part that Warman Jr. owned a 60% share of the company and 40% was owned by Griffin. (Defs.' App. Ex. 38.) In exchange for his ownership interest, Warman Jr. contributed $1,000 plus certain "Intellectual Property," identified as the "Licensing of marketing and business materials from Art of Fudge and Chocolate Moonshine Co." (Defs.' App. Ex. 38 at 15.) According to Defendants, this included the right to use the Chocolate Moonshine Co. trademark to sell fudge and other candy to the general public, as well as various marketing materials, including printed materials and photographs of the products which Chocolatier was going to sell. (Defs.' App. Ex. 13 at 145, 150-51, 160-62, 224, 237-39; Ex. 9 at 50-52.)

According to Defendants, Griffin had made it known that he did not want to work with Warman or to be involved with a company that Warman controlled. Rather, he wanted to work with Warman Jr. (Defs.' App. Ex. 13 at 83-85; Ex. 43, lines 124-30.) Warman Jr. represented to Griffin that he was the owner of the trademark, a fact which Griffin confirmed by looking it up online. (Defs.' App. Ex. 13 at 127-28, 151, 242-43; Ex. 15 ¶¶ 12-13.)

Plaintiffs dispute this account. Warman represents that he told Griffin that he owned the trademark, testifying, that Griffin "knew I owned Chocolate Moonshine. He attended and worked

shows with me." (Pls.' App. Ex. 7 at 100.)[11] *See also id.* at 102 ("I was crystal clear to [Griffin] that I owned all of Chocolate Moonshine and [Warman Jr.] has full authority to use the brand and you guys can use it as long as [he] is the majority owner.")

Warman Jr. advised Griffin that they had to file a fictitious name registration in order to allow Chocolatier to do business as Chocolate Moonshine. On June 13, 2017, Warman Jr. filed an Application and Registration of Fictitious Name with the Pennsylvania Corporation Bureau in which he registered the name Chocolate Moonshine as the name under which Chocolatier would do business. Warman was aware of and consented to this filing. (Defs.' App. Ex. 41; Ex. 8 at 94; Ex. 15 ¶ 32.)

Several years later, on March 16, 2019, Warman Jr. executed a Trademark License and Enforcement Agreement (the "License Agreement") that gave Chocolate Moonshine Holdings, LLC the power to enforce the trademark.[12] (Defs.' App. Ex. 45; see also Defs.' App. Ex. 8 at 145; Ex. 42.) Griffin was unaware of this agreement, however. (Defs.' App. Ex. 15 ¶ 45.) The Agreement expressly states that Warman Jr. granted a license to Chocolate Moonshine Holdings, LLC to use the "Chocolate Moonshine Co." trademark that was registered with the PTO at Registration No. 4734457. It also states, among other provisions, that Warman Jr. is the owner of the trademark (Defs.' App. Ex. 45 ¶ 6) and has the right to transfer a license to it. (*id.* ¶ 2.) The

---

[11] Defendants note that in another portion of his deposition, Warman responded "That's not a yes or no answer." (Defs.' App. Ex. 8 at 103.) If a witness's deposition testimony includes internal inconsistencies, "an issue of fact remains which, if genuine, will preclude resolution of the case on summary judgment." *Airlines Reporting Corp. v. Belfon*, 2010 WL 3664065, at *24 (D.V.I. Sept. 16, 2010).

[12] One of the Plaintiffs in this case is identified as Chocolate Moonshine, LLC. The Court takes judicial notice of the public records from the Pennsylvania Department of State which indicate that Chocolate Moonshine, LLC made an initial filing on July 22, 2014. A separate entity, Chocolate Moonshine Holdings, LLC, made an initial filing on February 11, 2019. Thus, based on the public regards, it appears that they are two separate entities. *See* https://file.dos.pa.gov/search/business (last visited Dec. 27, 2022).

Agreement further provides that Chocolate Moonshine Holdings, LLC may take all necessary steps to protect the mark. (*id.* ¶ 3.)

On June 26, 2019, Warman sent an email to Chocolatier, Griffin and Warman Jr., stating that they were no longer permitted to use the Chocolate Moonshine mark to sell fudge. (Defs.' App. Ex. 44.) Counsel for the Trust and Moonshine LLC then sent a cease-and- desist letter dated August 13, 2019, informing them that Moonshine LLC has the exclusive right to enforce the Chocolate Moonshine trademark and demanding that they cease using the trademark to sell fudge. (Defs.' App. Ex. 42.) The letter states that Plaintiffs "understand that" Chocolatier and/or Griffin "intend to conspire with" [Local Yokels] to sell unauthorized fudge to the customers provided in breach of your agreement and in violation of intellectual property rights." At that time, Warman Jr. was still the majority interest holder in Chocolatier and controlled the company. (Defs.' Supp. App. Ex. 71.)

According to Defendants, after receiving the cease-and-desist letter, Griffin asked Warman Jr. if he had given his father the right to control the trademark. While Warman Jr. initially denied it, he eventually admitted in September 2019 that he may have done so. (Defs.' App. Ex. 46 at 2.) On October 14, 2019, Warman sent Griffin a photocopy of the Trademark License and Enforcement Agreement that had been signed in March. (Defs.' App. Ex. 47.) Later, on December 31, 2019, Warman Jr. and Griffin entered into an agreement pursuant to which Griffin bought out Warman Jr.'s interest in Chocolatier, and Griffin agreed to pay an earnout payment on the fudge sold by Chocolatier to be split between Warman Jr. and Elle Warman, who is Warman Jr.'s sister and the daughter of Warman and Falvo. (Defs.' App. Ex. 9 at 135-37, 151.)

Defendants assert that Griffin and Warman Jr. had a license to use the Chocolate Moonshine trademark. They state that, with the knowledge of his father, Warman Jr. contributed

the right to use the trademark to Chocolatier and Griffin for the purpose of selling fudge. In turn, Plaintiffs claim that by virtue of the cease-and-desist letter, Warman withdrew any license they might have had on August 13, 2019. (Defs.' App. Ex. 42.) At the same time, however, Warman inconsistently indicated that they could use the mark as long as Warman Jr. remained the majority owner of the company which, as the record reflects, was until December 31, 2019. (Pls.' App. Ex. 7 at 102.)

### C.  <u>Facts Relating to the Copyright Claims</u>

#### 1.   <u>The Right to Use Photographs</u>

In May 2016, Warman Jr. asked Falvo assist him in setting up a photo shoot of fudge pieces in a variety of flavors for the purpose of displaying them on a website. (Defs.' App. Ex. 49; Ex. 9 at 77; Ex. 12 at 20.) Warman Jr. arranged for the photos to be taken by Michael Fornataro ("Fornataro"). The twelve photos Fornataro took are the subject of Plaintiffs' copyright infringement claims. (Defs.' App. Ex. 9 at 67-68, 77.)

Fornataro sent the photos and an invoice to Warman Jr. and Falvo on May 21, 2016, and requested payment of the invoice. (Defs.' App. Ex. 12 at 32-33; Ex. 52 Ex. 2.) The parties dispute who paid the invoice, but Defendants assert that Warman Jr. received ownership of and the right to use the twelve photos for the purpose of selling fudge.

In December 2016, Warman Jr. organized an LLC identified as "Chocolate Moonshine Online, LLC ("Online"), for the purpose of selling fudge online through a website. (Defs.' App. Ex. 48; Ex. 9 at 11, 13.) Warman Jr. was and is the 100% owner and only member of Online. (Ex. 9 at 12.)

Warman Jr. permitted Griffin to use the photos taken by Fornataro to sell fudge by Chocolatier and believed that he had the authority to allow their use for this purpose. (*Id.* at 69-

70.) Warman Jr. instructed Griffin to take the photos directly from the website. (Defs.' App. Ex. 15 ¶¶ 30-31.) In June 2017, Warman Jr. sent Griffin an email with an attachment known as a "price card" on which four of the twelve fudge photos were displayed, stating "I just combined the Father's Day sign with the price sign. Let me know what you think." (Defs.' App. Ex. 50; Ex. 9 at 68, 70.)

Defendants contend that in the Operating Agreement (Defs.' App. Ex. 38), Warman Jr. agreed to license to Chocolatier and Griffin the right to use the photos and that four of them were used to make a price card for use by Chocolatier to sell fudge. Thus, Defendants contend, Griffin reasonably and correctly believed that if Warman Jr. allowed the use of the photos to sell fudge through Chocolatier, he had the authority to do so. (Defs.' App. Ex. 13 at 224.)

Warman Jr. did not recall ever telling Griffin that the photos were created to be used by his father, nor did Warman Jr. tell Griffin that he was not permitted to use the photos to sell fudge through Chocolatier. (Defs.' App. Ex. 9 at 72, 74, 76; Ex. 15 ¶ 35.)

In March 2020, several months after Griffin bought out Warman Jr.'s interest in Chocolatier, counsel for Warman contacted Fornataro and entered into a Copyright Assignment Agreement in which Fornataro assigned to the Trust a copyright in the twelve photos which Fornataro had taken and given to Warman Jr. Griffin was not aware of this development. (Defs.' App. Ex. 12 at 37-42; Ex. 53.) According to Fornataro, "The Warmans were having issues with someone else using my photographs, so I decided to sell the copyrights to those photos to them." (Defs.' App. Ex. 12 at 39.)

Plaintiffs have submitted certain facts that are inconsistent with those on which Defendants rely. Warman testified that Griffin knew that the photos were created using Warman's fudge and his formula, under his brand, and that the photo shoot was for Moonshine LLC and its website.

(Pls.' App. Ex. 7 at 112-13, 126, 128.) They also claim that Fornataro assigned any copyright interest he had in the photos to Chocolate Moonshine Holdings, a company owned by Warman.[13] Warman testified that he paid Fornataro for the rights to use the photos. (Defs.' App. Ex. 12 at 39; Pls.' App. Ex. 7 at 137-38, 143-44.) Warman also contends that Warman Jr. and Chocolatier had the authority to use the photos until the cease-and-desist letter was sent to them, but Griffin continued to use the photos thereafter. (Defs.' App. Ex. 7 at 112, 125, 130.)

2.  Right to Enforce Copyright

Defendants state that a copyright relating to the photos was registered on April 6, 2020.[14] Prior to that date, only Fornataro, who sold to Warman Jr. the right to use twelve of them, had the authority to prohibit the use of the photos. (Defs.' App. Ex. 53.) Thus, they contend, after Fornataro sold the copyright to the Trust, the Trust was permitted to enforce it with respect to past infringements. However, Griffin's use of the photos could not constitute an infringement because he had received the right to use them from Warman Jr. Because he had permission from Warman Jr., Griffin's use of a price card with four of the photos in January 2020, was not copyright infringement. Moreover, Warman Jr. did not tell him that he could not use the photos. (Defs.' App. Ex. 15 ¶¶ 52-54.)

By contrast, Plaintiffs assert that, even if Warman Jr. had an oral license to use the photos, he did not have an oral agreement to sublicense the photos to a third party such as Griffin. Further, as noted above, they dispute that the evidence of record supports Defendants' claim that Warman

_____

[13] *See* Plaintiff's Responsive Statement at 16-17. However, the Copyright Assignment Agreement states that it is between Fornataro and the Trust. (Defs.' App. Ex. 53.)

[14] This statement is not supported by any evidence of record. While Defendants cite to Exhibit 53, this exhibit is the assignment by Fornataro of the copyright to Warman on March 19, 2020. Notably, however, Plaintiffs do not dispute this statement and appear to agree. (ECF No. 132 at 19.)

Jr. had a copyright interest in the photos.

### 3.  Use of the Photos

Defendants contend that there is no evidence that Falvo, Konieczny or Local Yokels ever used any of the copyrighted photos after April 6, 2020. In disputing this contention, Plaintiffs rely on Warman's testimony. According to Plaintiffs, after Griffin and Chocolatier were served with the cease-and-desist letter, Falvo told Warman that Warman Jr. owned the brand and stated "You can't stop us." Warman represents that he understood Falvo's reference to "us" to mean Griffin, Falvo, Konieczny and Local Yokels. (Pls.' App. Ex. 1 ¶ 10a.) After his conversation with Falvo, Warman contacted Griffin, who said that he already had spoken with Falvo, and she told him that Warman did not own the brand. (*Id.* ¶ 10b.)

Plaintiffs further contend that Griffin, as part of an overall plan on behalf of Local Yokels to steal the intellectual property of Moonshine, and with the encouragement of his partners, Falvo and Konieczny, created a new brand called Chocolate Fusion. He then used the Chocolate Moonshine photographs sometime in 2020 by replacing its name with Chocolate Fusion's name. (*Id.* ¶ 10c.)

Based upon the facts submitted by the parties, the Court will proceed to with an analysis of Defendants' motion.

## III.    Standard of Review

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**IV.    Analysis**

> **A.   <u>Trade Secret Claims</u>**

Plaintiffs' claims in Counts I and II are asserted under the DTSA and the PUTSA, respectively. As the Court of Appeals has noted: "The DTSA and the PUTSA are substantially similar, as both are closely related to the Uniform Trade Secrets Act." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 381 n.19 (3d Cir. 2021). In fact, the definitions of "trade secret" under the DTSA and the PUTSA are nearly identical. *Id.* Under the DTSA:

> the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns,

plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). And as stated in the PUTSA, a trade secret is:

Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. C.S. § 5302.

Under Pennsylvania law, the following factors are considered in determining whether certain information is a trade secret: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Iron Age Corp. v. Dvorak,* 880 A.2d 657, 663 (Pa. Super. 2005). "The crucial indicia for determining whether certain information constitutes a trade secret are substantial secrecy and competitive value to the owner." *Id.*

Further, as noted in *Mallet*,

> information will not necessarily be deprived of protection as a trade secret because parts of it are publicly available. A confidential compilation and organization of public information can amount to a trade secret. "Courts have long recognized that 'a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'"

*Id.* at 386 (quoting *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 96 (4th Cir. 2018)). *See also Elmagin Capital, LLC v. Chen*, 555 F. Supp. 3d 170, 179 (E.D. Pa. 2021) ("A combination of different elements may constitute a trade secret, even if each element is otherwise generally known or readily ascertainable, as long as the combination is unique and offers a competitive advantage.")[15]

Defendants contend that they are entitled to judgment in their favor with respect to Plaintiffs' federal and state trade secret claims. As they discuss at some length, they contend that the ingredients and process for making the fudge are in the public domain because they have been well-known for some time and are disclosed in the '961 patent that was issued to another party. Moreover, they have submitted reports from two experts who opine that the fudge recipe is not a trade secret. Defendants note that "information in patents cannot – at least by itself – constitute trade secrets." *Mallet,* 14 F.4th at 371.

Plaintiffs argue that "[w]hether information rises to the level of a trade secret under PUTSA is a question of fact." *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 705 (E.D. Pa. 2014) (citation omitted). *See also Syngy, Inc. v. ZS Assocs., Inc.*, 2015 WL 899408, at *9 (E.D. Pa. Mar. 3, 2015) ("The question of whether certain information constitutes a trade secret ordinarily is best

---

[15] In their reply brief, Defendants contend that "every component of the recipe [and] the exact manner in which those components are combined … is also known throughout the fudge making industry." However, Plaintiffs dispute this factual assertion and Defendants cite no authority in support of their legal position.

resolved by a fact finder after full presentation of evidence from each side.")  Warman has testified that the recipe in the '961 patent is not the same as the recipe that he calls his trade secret, that he made significant changes to the recipe he purchased from Saucier and that the compilation of ingredients and processes constitutes the trade secret even if all of the ingredients are in the public domain or are commonly available.[16]

Defendants also argue that they are entitled to summary judgment because Warman admitted that Defendants' recipe calls for a certain ingredient that he does not use and for another ingredient to be added after cooling, and as such, their resulting product is not an infringement of Warman's recipe. As noted above, however, Warman observed Defendants using his fudge recipe and has stated categorically that Defendants were using his recipe, not the recipes disclosed in the '961 patent. Thus, this admission is not sufficient to defeat Plaintiffs' claims.

Further, Defendants contend that because many others, including Falvo, Griffin, Saucier and her employees, Weiner and Sullivan, know the recipe and have used it, it is not a trade secret. A trade secret does not include "an employee's general knowledge and skill." *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985). *See also Pittsburgh Cut Wire Co. v. Sufrin*, 38 A.2d 33, 34 (Pa. 1944) ("A man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, are not

---

[16] Defendants refer to Warman's affidavit as "self-serving." The Court of Appeals has stated that "the testimony of a litigant will almost always be self-serving since few litigants will knowingly volunteer statements that are prejudicial to their case. However, that has never meant that a litigant's evidence must be categorically rejected by the fact finder." *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 321 n.2 (3d Cir. 2014). Defendants also refer to it as a "sham affidavit" with respect to the issue of the six-degree spread. *See EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 268 (3d Cir. 2010) (courts are permitted to ignore sham affidavits that contradict earlier deposition testimony without adequate explanation). However, they also note that Warman "falsely claimed this six-degree spread in his deposition." Thus, the affidavit is not a sham; rather, Defendants merely dispute Warman's position about the six-degree spread.

the property of his employer.")

Plaintiffs reject Defendants' implication that "every effort" must be made to keep a trade secret from public knowledge: "Based on the statute's use of the word 'reasonable,' it is clear that an owner need not take 'every conceivable measure' to shroud his or her trade secret in absolute secrecy." *Houser v. Feldman*, 569 F. Supp. 3d 216, 229 (E.D. Pa. 2021). Rather, the owner need only take "reasonable measures." Courts have held that whether measures were reasonable is a question of fact and "the determination of whether a plaintiff's efforts to maintain the secrecy of its alleged trade secrets were reasonable is not a question susceptible of black-or-white analysis." *Alpha Pro Tech, Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 437 (E.D. Pa. 2013). Here, Warman identifies those measures that he took to keep the recipe a secret and Defendants dispute these facts. Thus, genuine issues of material fact exist regarding whether Warman took reasonable measures to guard the secrecy of what he claims to be a trade secret.

Plaintiffs assert that the Pennsylvania Superior Court explicitly held that the same fudge recipe that is at issue in this case qualifies as a trade secret. *See Christopher M's Hand Poured Fudge, Inc. v. Hennon*, 699 A.2d 1272, 1275 (Pa. Super. 1996). *See also Sysco Corp. v. FW Chocolatier, LLC*, 2013 WL 11254806, at *6 (Pa. Super. Aug. 27, 2013). As Defendants correctly point out, however, because the underlying case related to a preliminary injunction, it was not a final decision on the merits. Further, the evidence in this case differs from what was previously presented as Warman has acknowledged that he would no longer describe certain ingredients as unique to his recipe (as he represented in the prior cases) and the '961 patent was not brought to the attention of the courts in those cases.

Despite the extensive discussion of the prior state court cases, Plaintiffs do not contend that these decisions have any preclusive effect here. Rather, they cite them to demonstrate that a fudge

recipe can be a trade secret and the recipe at issue has been found to be a trade secret in prior decisions. The Court agrees that while evidence about the prior adjudications may be relevant, these decisions are not determinative of whether Plaintiffs possess a trade secret.

A careful consideration of the evidence of record compels the conclusion that disputed issues of fact exist. This includes whether the fudge recipe is the same as the one in the '961 patent, whether Warman made significant changes to the recipe he purchased from Saucier, whether the compilation of ingredients and processes is unique, the extent to which the claimed trade secret is known outside Plaintiffs' business, whether reasonable measures were taken to protect it and the ease with which it can be duplicated.

Because there are genuine issues of material fact about whether Plaintiffs' fudge recipe, process and operation constitute a trade secret, Defendants' motion for summary judgment as to Counts I and II will be denied.

**B.  Trademark Claims**

Defendants contend that they are entitled to judgment in their favor with respect to the trademark infringement claims in Counts III and V. Because the records of the PTO indicate that the trademark has been cancelled through abandonment (*see also* Defs.' App. Ex. 54), they do not independently seek to have the trademark canceled. Rather, Defendants contend that because the trademark was procured by fraud on the PTO, any cause of action Plaintiffs might have for damages or any other remedy prior to the abandonment should be dismissed. They assert that this is so because Warman Jr. misrepresented that he owned the mark when it was actually owned by his father, and because Griffin and Chocolatier had a license to use the mark.

Plaintiffs claim that the facts relevant to this issue are vigorously disputed. They argue that Defendants have failed to show that their intent was to defraud the PTO. Further, Warman

withdrew the license when he sent a cease-and-desist letter to Griffin and Chocolatier.

It is first necessary to determine if the trademark was originally procured through fraud.

As stated by the Third Circuit in *Covertech Fabricating, Inc. v. TVM Building Products, Inc.*, 855

F.3d 163, 174-75:

> The Lanham Act provides that a third party may petition for cancellation of a registered trademark if the registration was procured by fraud, 15 U.S.C. §§ 1064(3), 1120, a showing that must be made by clear and convincing evidence that the "applicant or registrant knowingly ma[de] a false, material representation with the intent to deceive the PTO," *In re Bose Corp*., 580 F.3d 1240, 1245 (Fed. Cir. 2009); *see Marshak v. Treadwell*, 240 F.3d 184, 196 (3d Cir. 2001). That intent to deceive can be inferred from indirect or circumstantial evidence, *In re Bose Corp*., 580 F.3d at 1245, indicating that "the registrant actually knew or believed that someone else had a right to the mark," *Marshak*, 240 F.3d at 196.

A district court has the power to "order the cancellation of [trademark] registrations." 15 U.S.C.

§ 1119. *See also Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 873 (3d Cir.

1992). The burden of proof was articulated by the Federal Circuit in *In re Bose Corp.*:

> A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof. Indeed, "the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party."
>
> [T]here is "a material legal distinction between a 'false' representation and a 'fraudulent' one, the latter involving an intent to deceive, whereas the former may be occasioned by a misunderstanding, an inadvertence, a mere negligent omission, or the like."

580 F.3d at 1243 (citations omitted). "Fraud, moreover, will not lie if it can be proven that the

statement, though false, was made with a reasonable and honest belief that it was true or that the

false statement is not material to the issuance or maintenance of the registration." *Woodstock's*

*Enterprises Inc. (California) v. Woodstock's Enterprises Inc. (Oregon)*, 43 U.S.P.Q.2d 1440

(T.T.A.B. 1997).

Here, the uncontroverted facts show that the misrepresentations were material. Since the

PTO requires the owner of a trademark to seek registration, it would not have issued a trademark to Warman Jr. if he had revealed that he did not own the mark and was falsely seeking registration for a trademark owned by his father. Further, there is no basis to conclude that Warman Jr.'s misrepresentations to the PTO were the result of a misunderstanding, negligence or a mere omission as Plaintiffs attempt to suggest. It is uncontroverted that Warman Jr. applied for the trademark despite the fact that he knew the mark was owned by his father. Indeed, according to the evidence of record, Warman Jr., who was not the owner of "Chocolate Moonshine Co.," applied for a trademark in order to be a "placeholder" for his father. This was done with his father's knowledge because of Falvo's prior conduct and concerns related to what actions she might take. While Plaintiffs contend that, taken alone, this does not demonstrate an intent to defraud the PTO, they have not submitted any evidence that contradicts Warman Jr.'s knowingly false sworn statement to the PTO that he owned the trademark when he admits that he did not. Nor have they created a genuine issue of material fact to suggest that Warman Jr. did not intend to defraud the PTO. Thus, the record evidence demonstrates that this deception was willful and reflects an intent to deceive the PTO into issuing the trademark in the name of Warman Jr.

Since Warman Jr. procured the trademark by fraud, the Court would have cancelled his registered trademark if it had not already been abandoned. Based on these circumstances, it then must be determined if any of the Plaintiffs can pursue the trademark infringement claims asserted in the Amended Complaint. As pleaded in the Amended Complaint, Plaintiffs base their trademark claims solely on the registered trademark and seek relief under the Lanham Act, 15 U.S.C. § 1125. (ECF No. 51 ¶ 15.) In Count V, Plaintiffs allege that Chocolatier and Griffin sell "unauthorized fudge" using the Chocolate Moonshine name. Count III claims that Falvo and Yokels induced

Chocolatier and Griffin to sell unauthorized fudge under the Chocolate Moonshine name.[17]

Plaintiffs allege in the Amended Complaint that Moonshine LLC has the exclusive rights to the enforcement (and use) of the trademark. Moonshine LLC claims to have acquired these rights "from an agreement from the registered trademark owner." Since Warman Jr. obtained the trademark through fraud and therefore, did not rightfully own it, his attempt to license it was ineffective. Even if the License Agreement transferred the license and enforcement rights despite Warman Jr.'s misrepresentations, however, it expressly provides that Chocolate Moonshine Holdings, LLC, not Moonshine LLC, has the exclusive right to enforce the trademark. Chocolate Moonshine Holdings, LLC is not a party in this action. None of the other plaintiffs allege in the Amended Complaint that they have the right to enforce the trademark. Therefore, none of the Plaintiffs can assert a claim for trademark infringement against Defendants.

For these reasons, Defendants are entitled to judgment in their favor on Counts III and V.

## C. **Copyright Claims**

Defendants argue that they are entitled to judgment in their favor regarding Plaintiffs' copyright claims that are related to the photographs in Counts XII and XIII. Among other arguments, they assert that since a copyright was not registered until April 6, 2020, only Fornataro, the photographer, had the authority to prohibit their use, and he previously sent them to Warman Jr. for his use. Further, Warman Jr. agreed to give Griffin and Chocolatier a license to use the photos. Defendants also contend that neither Falvo, Konieczny nor Local Yokels ever used, published or copied the photos after the copyright was registered.

Plaintiffs counter that Fornataro never conveyed ownership to Warman Jr. and that the

---

[17] Curiously, Warman states in his declaration that Griffin, with the encouragement of Falvo and Konieczny, actually covered up the name Chocolate Moonshine with the name Chocolate Fusion on the photographs at issue.

Operating Agreement does not explicitly state that Warman Jr. gave a license to Chocolatier and Griffin. They also claim that there are factual disputes about whether Griffin infringed the copyright and if Plaintiffs had a copyright interest prior to April 6, 2020.

Ownership of a copyright is freely transferrable "by any means of conveyance or by operation of law." 17 U.S.C. § 201(d). However, a transfer (other than one by operation of law) "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). *See Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 827 (3d Cir. 2011). Here, there is no evidence that Fornataro executed any writing that transferred ownership of the photos to Warman Jr.

Copyrights can also be licensed. "Copyright licenses are a type of contract and, therefore, governed by common law contracting principles." *Bitmanagement Software GmBH v. United States*, 989 F.3d 938, 946 (Fed. Cir. 2021) (citation omitted). "Thus, as with implied-in-fact contracts, an implied-in-fact license 'is one founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Id.* (quoting *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990)). Finding such a license ordinarily "requires finding of: 1) mutuality of intent to contract; 2) consideration; and, 3) lack of ambiguity in offer and acceptance." *El Centro*, 922 F.2d at 820.

According to Warman Jr., he and Falvo arranged for the photo shoot with Fornataro. Fornataro testified that Warman Jr. contacted him to take the photos and it was his understanding that the purpose was to advertise their products on a website. Warman Jr. and Falvo attended the photo shoot. While who paid for the photos is disputed, Fornataro sent the photos to Warman Jr.

26

and Falvo in May 2016. As such, the Court concludes that Fornataro gave Warman Jr. and Falvo a license to use the photographs that he gave to them for use on a website. Whether Fornataro granted a license to Warman Jr. to use the photos for use by Chocolatier is more problematic; at the same time, however, there is no evidence that he disputed this use.

Warman Jr. testified that the purpose of the photos was to sell fudge through Chocolate Moonshine Online, the LLC formed by Warman Jr. in December 2016, and was also to be used by Chocolatier at shows and other places. He testified that he permitted Griffin to use the photos displayed on the Chocolate Moonshine website in order to sell fudge through Chocolatier and believed that he had the right to do so. He does not recall ever telling Griffin that the photos were taken for his father's company or that Griffin was not permitted to use them. Griffin believed that the photos were owned by Online or Warman Jr. (Defs.' App. Ex. 15 ¶ 28.)

Griffin used the photographs during 2017, 2018 and 2019. (*Id.* ¶ 36.) There is no evidence that anyone objected to his use.

The August 2019 cease and desist letter relates to use of the Chocolate Moonshine mark and makes no reference to the photographs that Fornataro licensed to Warman Jr. Even assuming that Warman, as opposed to Warman Jr., had a right to the photos, Warman testified that he gave Warman Jr. permission to use the photos for the sale of fudge by Chocolatier for "the entire time until [Griffin] took over the business." (Defs.' App. Ex. 7 at 112, 125.) Further, if his son wanted to use the photos in a "Chocolate Moonshine shop," he could do so. (*Id.* at 137.) Warman Jr. continued to be associated with Chocolatier until December 31, 2019, when he sold his interest to Griffin. Thus, between May 2016 through at least December 31, 2019, Warman Jr. had permission

to use the photos.[18]

There is no evidence that Griffin was told by Warman or Warman Jr. *at any time* not to use the photos (Defs.' App. Ex. 15 ¶ 52). Fornataro assigned the photos to the Trust on March 19, 2020 and testified that he did so based on his understanding that "*the Warmans*" were having issues with someone else using them, so he sold his rights to them. The copyright was registered to the Trust on April 6, 2020. Griffin stated that he used several of the photos in January 2020 but did not use the photos after April 6, 2020. (Defs.' App. Ex. 15 ¶¶ 53, 54.) Warman's assertion that Griffin used the photos *sometime* in 2020 for a competing brand not only lacks any detail about when or how this is alleged to have occurred, but also whether it was before or after the assignment of the copyright. Thus, there is no admissible evidence that Griffin used the photos after the copyright was registered.

The Amended Complaint alleges in Count XIII that Griffin and Chocolatier used the photos without authorization by copying them from Moonshine's website, and further, that Falvo, Local Yokels and Konieczny copied the photos from the website and other places and provided them to Griffin and Chocolatier. The uncontroverted evidence fails to support this claim. In fact, Griffin and Chocolatier had authorization from Warman Jr., who supplied the photos for their use. There is no evidence in the record that it was Falvo, Local Yokels or Konieczny who provided them to Griffin or Chocolatier. Therefore, Griffin and Chocolatier are entitled to judgment in their favor on Count XIII.

Count XII asserts a claim for contributory copyright infringement against Falvo, Local

---

[18] The Operating Agreement between Warman Jr. and Griffin provides that the initial contribution of Warman Jr. to Chocolatier included "Intellectual Property:  licensing of marketing and business materials from… Chocolate Moonshine Co." While the parties dispute whether this included the photographs, it is uncontroverted that Warman Jr. allowed Griffin and Chocolatier to use them.

Yokels and Konieczny. Plaintiffs allege that they induced the use of the photos by Griffin and Chocolatier by providing copies or encouraging or instructing them to copy them from Moonshine's website. Plaintiffs also claim that these defendants knew or had reason to know that they were protected by copyright and that the use of the photos by Griffin and Chocolatier would constitute copyright infringement.

Courts have held that "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (footnote omitted). *See Resnick v. Copyright Clearance Ctr., Inc.*, 422 F. Supp. 2d 252, 258 (D. Mass. 2006) ("A defendant is not liable under a contributory or vicarious theory of liability unless plaintiffs show direct infringement by a third party.")

There is no evidence of inducement here. Plaintiffs attempt to support their claim and create genuine issues of material fact solely through Warman's sworn declaration. He states that after the cease and desist letter was sent, Falvo told him that Warman Jr. owns the brand and stated "you can't stop us." Notably, however, Warman's self-serving interpretation of her statement lacks any evidentiary foundation. Moreover, assuming that Falvo made this statement, it has no relevance to the copyright issue; references to the "brand" and the cease and desist letter, which doesn't even mention the photos, are not relevant to the issue of whether Griffin and Chocolatier had permission to use the photos. Warman also states in his declaration that at some unspecified time in 2020, Griffin, with the encouragement of Falvo and Konieczny, continued to use the photographs for a new brand. Because this statement would be inadmissible at trial without any evidentiary support or foundation, it does not create a genuine issue of material fact regarding Griffin's use, or lack of use, of the photos after April 6, 2020 or for any improper purpose. Further, it does not create an

issue of fact regarding the alleged actions of Falvo, Local Yokels or Konieczny.

For these reasons, Plaintiffs have failed to proffer any admissible evidence to support their claim of contributory copyright infringement. Therefore, Defendants are entitled to judgment in their favor on Count XII.

### D. State Law Claims

Defendants contend that because Plaintiffs' state law claims of tortious interference (Counts IV and VI) and breach of contract (Counts VII and VIII) depend upon the viability of Plaintiffs' trade secret, trademark or the copyright claims, they should also be dismissed. Further, they contend that the defamation claim (Count XI) has no evidence to support it.

A review of these claims in the Amended Complaint suggests that at least some portion or all of Counts VI, VII and VIII relate to the trade secret claim. While more difficult to ascertain, it is also conceivable that Count IV relates to trade secret issues. Because the Court is not dismissing claims related to the alleged trade secret, there is no basis to dismiss the tortious interference or breach of contract claims. However, to the extent that any of these claims are based upon trademark or copyright infringement, Defendants are entitled to judgment in their favor.

With respect to the defamation claim, Defendants' only argument consists of a single sentence: "Plaintiff Warman has produced no undisputed evidence which would sustain a cause of action for Defamation under Count XI and such count must also be dismissed." (ECF No. 120 at 40.) As the moving party, however, it is Defendants' burden to demonstrate that they are entitled to summary judgment because of the absence of any genuine issue of material fact. *Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir. 2001). They have failed to do so.

Therefore, with respect to the state law claims in Counts IV, VI, VII, VIII and XI, Defendants' motion for summary judgment will be denied.

**V.      Conclusion**

For the reasons set forth herein, Defendants' Motion for Summary Judgment (ECF No.

116) will be granted in part and denied in part.

An appropriate order will follow.


Dated: December 27, 2022

                                                    BY THE COURT:

                                                    s/Patricia L. Dodge
                                                    PATRICIA L. DODGE
                                                    United States Magistrate Judge