IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER M. WARMAN, et al., | ) |
| Plaintiffs, | ) Civil Action 19-1224 |
| vs. | ) Magistrate Judge Patricia L. Dodge |
| LOCAL YOKELS FUDGE, LLC, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiffs Christopher M. Warman ("Warman"), the Trust for Family of Christopher Warman (the "Trust") and Chocolate Moonshine, LLC ("Moonshine LLC") brought this action against Defendants Local Yokels Fudge, LLC ("Local Yokels"), Christine Falvo ("Falvo"), Charles Brian Griffin ("Griffin"), Donald Konieczny ("Konieczny") and CM Chocolatier, LLC ("Chocolatier"). The Amended Complaint asserts various federal and state law claims, some of which arise out of Defendants' alleged use of Plaintiffs' recipe for making fudge, which they claimed to be a trade secret. The case was tried before a jury and the jury rendered a verdict in favor of Plaintiffs, as described below.

Pending before the Court is Defendants' Motion For Judgment As a Matter of Law Pursuant to Fed. R. Civ. P. 50(b) for Plaintiffs' Failure to Prove That the Alleged Trade Secret Fudge Recipe Had Independent Economic Value By Reason of Its Being Kept Secret (ECF No. 436). For the reasons that follow, the motion will be denied.

I. **Relevant Procedural History**

Plaintiffs commenced this action in September 2019 and subsequently filed an Amended Complaint on August 27, 2020 (ECF No. 51). The Amended Complaint included thirteen counts, including trade secret misappropriation in violation of the Defend Trade Secrets Act, 18 U.S.C.

§§ 1831-39 ("DTSA") (Count I) and the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. §§ 5301-08 ("PUTSA") (Count II).

On December 27, 2022, an opinion and order were issued that granted Defendants' motion for summary judgment as to Plaintiffs' trademark and copyright claims and denying it in all other respects (ECF Nos. 159, 160).

A jury trial commenced on November 27, 2023, with respect to Plaintiffs' remaining claims. At the conclusion of Plaintiffs' case in chief, Defendants orally moved under Rule 50(a)(1) for judgment as a matter of law on two grounds: failure to prove independent economic value and failure to prove reasonable efforts to protect the trade secret. After hearing argument on the matter, the Court denied the motion on both grounds and the trial proceeded. (ECF No. 342.)

At the conclusion of the trial, the jury rendered a verdict that the recipe was a trade secret owned by the Trust, that Defendants Falvo, Konieczny and Local Yokels were liable for trade secret misappropriation under federal and state law and that Defendant Chocolatier was liable for unjust enrichment. The jury separately awarded damages against Falvo, Konieczny and Local Yokels and Chocolatier (ECF No. 288).

On December 27, 2024, Defendants filed the motion currently under consideration (ECF No. 436), which has been fully briefed (ECF Nos. 437, 462, 471).[1]

**II.   Standard of Review**

Rule 50(b) of the Federal Rules of Civil Procedure provides that a movant may make a renewed motion for judgment as a matter of law no later than 28 days after the entry of judgment.

---

[1] Following the trial, the parties engaged in various motions practice and settlement discussions overseen by the Court. As a result, and with the parties' consent, judgment on the jury's verdict was not entered until December 2, 2024 (ECF No. 423). Defendants' Rule 50(b) motion was timely filed within 28 days of the judgment.

In ruling on the motion, a court may allow judgment on the verdict, order a new trial or direct the entry of judgment as a matter of law. (*Id.*)

The Court of Appeals for the Third Circuit has held that "a judgment notwithstanding the verdict may be granted under Fed. R. Civ. P. 50(b) only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (citation omitted). In reviewing the motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). The Third Circuit has "cautioned that a court should grant judgment as a matter of law 'sparingly.'" *Pitts v. Delaware*, 646 F.3d 151, 155 (3d Cir. 2011) (citation omitted). "The court must consider the entire record of evidence from trial . . . to decide the Rule 50(b) motion. *Kramer v. Grillo*, 2018 WL 1755389, at *1 (W.D. Pa. Apr. 12, 2018) (citing *Trustees of Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 903 (3d Cir. 1987)).

### III. Discussion

A trade secret is "defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret." *Oakwood Laboratories LLC v. Thanoo,* 999 F.3d 892, 905 (3d Cir. 2021) (citing 18 U.S.C. § 1839(3)). In order for information to constitute a trade secret, it must, among other things:

> derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3)(B). *See also Elmagin Capital, LLC c. Chao Chen,* 2024 WL 2845535 (3d Cir. Mar. 21, 2024); *Synopsys, Inc. v. Risk Based Security, Inc.,* 70 F. 4th 759, 774 (requiring proof not

3

only of economic value but value of trade secret "arising from [its] remaining secret"). The PUTSA contains a nearly identical provision. 12 Pa. C.S. § 5302. *See Mallet & Co. Inc. v. Lacayo,* 16 F.4th 364, 381 n.19 (3d Cir. 2021) ("the DTSA and the PUTSA are substantially similar" with "almost identical" trade secret definitions).

> Factors to be considered in evaluating whether a trade secret exists include:
>
> (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Restatement of Torts § 757 comment b (1939); *International Election Systems Corp. v. Shoup,* 452 F. Supp. 684, 706 (E.D. Pa. 1978), *aff'd,* 595 F.2d 1212 (3d Cir. 1979).

*SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1256 (3d Cir. 1985).[2]

Defendants acknowledge that Warman testified about what he characterized as the economic value of his recipe. They argue, however, that he provided no plausible basis, other than his own self-serving observations, from which a jury could have found in Plaintiffs' favor on this issue, and this was the sole evidence offered to establish economic value. In support of their argument, Defendants rely in part on a series of decisions holding that the plaintiff had not established independent economic value. *See Spirits v. Ragghianti*, 2024 WL 3177773, at *4 (3d Cir. June 26, 2024) (dismissing DTSA claim because "it does not allege that either the recipes or the labels derived independent economic value from not being generally known, nor does it allege any facts from which that claim might plausibly be inferred."); *Contour Data Sols. LLC v.*

---

[2] Expert testimony is not required to demonstrate that a trade secret has independent economic value. *See, e.g., Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 110 (3d Cir. 2010) (affirming order granting preliminary injunction where district court found that recipe for English muffins was a trade secret without relying on expert testimony).

4

*Gridforce Energy Mgmt. LLC*, 2024 WL 3970455, at *17 (E.D. Pa. Aug. 28, 2024) (cybersecurity system did not have independent economic value based on its secrecy because such systems may be kept secret for various reasons unrelated to preserving their value, the extensive work of the engineering team alone could not establish it, and the cost of recreating it only showed that there was nothing particularly secret about it); *Health Care Facilities Partners, LLC v. Diamond*, 2023 WL 3847289, at *10-11 (N.D. Ohio June 5, 2023) (conclusory statements of economic value in an affidavit were insufficient to withstand summary judgment); *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 378 (Ohio 2000) (same); *Green Crush, LLC, v. Paradise Splash I, Inc.*, 2019 WL 8640654, at *9 (C.D. Cal. Nov. 25, 2019) (same).[3] Unlike this case, all of these decisions were at the summary judgment or motion to dismiss stage.

In this case, the jury heard extensive testimony from Warman on both direct and cross-examination on the issue of economic value. Regarding the development of his fudge recipe, he testified that he began experimenting in 1984 to create "the perfect fudge" and continued to do so until it was perfected in 1989. (ECF No. 462-1 at 10:20-22, 12:19-23; 18:5-19; 24:4-10.) He met with various experts in the field of fudge making. (*Id*. at 17:21-25.) Warman also purchased a fudge recipe from Annette Saucier in 1988 for approximately $100,000 to $140,000. (*Id.* at 16:1-17; 135:13-20.)[4] However, it "was not viable for national distribution." (*Id.* at 19:5-20:4; 21:3-11.)

---

[3] In *Buffets, Inc. v. Klinke*, 73 F.3d 965 (9th Cir. 1996), another case on which Defendants rely, the Court of Appeals for the Ninth Circuit affirmed a district court's holding on summary judgment that that a restaurant chain failed to demonstrate that certain recipes had independent economic value. *Buffets* is distinguishable for several reasons: the recipes could easily be discovered by others; while the plaintiff claimed that limiting food costs was crucial to its profitability, the recipes played no part in limiting costs; and because the recipes had to be simplified any economic benefit came from the "translated" versions of the recipes. *Id.* at 968-69.

[4] Defendants point to Warman's contradictory testimony that he purchased the recipe from Saucier for only $20,000 and that he spent another $120,000 for the right to sell the fudge in the New England area. (ECF No. 441 Ex. B at 9.) Nevertheless, it was the province of the jury to resolve

5

The final fudge recipe he created was different from Saucier's recipe. (*Id.* at 24:8-26:7.) Warman claimed that he was losing batches of fudge frequently with the Saucier recipe, but after he created the trade secret recipe, Warman did not lose a single batch of fudge. (*Id.* at 25:22-25.)[5]

Thus, according to Warman, he spent a significant amount of time, money and effort to develop the fudge recipe. Although Defendants cross-examined him at some length on this issue, including his statement that the formula was ultimately from a divine source, there was sufficient evidence for the jury to conclude that Warman did, in fact, develop a fudge recipe. And while Defendants presented evidence during the trial regarding the number of fudge recipes that exist in the public domain, Warman testified that his recipe was unique and unlike any of these recipes. It was within the province of the jury to weigh the credibility of Warman's testimony.

With respect to the value of the trade secret, Warman testified that since 1989, when he claims to have created the trade secret fudge recipe, he has sold fudge using recipe at large retail stores such as Costco, Sam's Club, Walmart, BJ's Wholesale Club, and Hickory Farms. (*Id.* at 26:13-18; 31:3-10; 35:9-12; 38:4-10; 52:6-8.) He has also sold fudge on QVC and through Hershey. (*Id.* at 26:13-22; 35:9-22.) According to Plaintiffs, as of the trial date, Warman had sold hundreds of thousands of gift boxes of fudge on QVC and his product was QVC's number-one selling fudge. (*Id.* at 26:21-22; 56:3-7.)[6] In 2018, Warman appeared on "Good Morning America"

---

any potential conflicts in the testimony and in resolving a Rule 50(b) motion, the Court must draw all reasonable inferences in favor of the nonmoving party.

[5] Defendants argue that Warman first spent years and hundreds of thousands of dollars to develop a recipe but failed, then "he prayed, put his own work aside, and bought a recipe." (ECF No. 471 at 2.) They cite no authority to support their implication that "the amount of money and effort spent in developing the information" cannot be considered if the final version is the result of "inspiration."

[6] Defendants contend that "none of the QVC purchasers—by definition—had ever tasted Warman's fudge in the first place." (ECF No. 471 at 3.) They provide no support for this statement nor do they explain why this is relevant to the value of the trade secret to Plaintiffs or their competitors.

and sold $187,000 of fudge within several minutes. (*Id.* at 56:10-11.)[7] Warman was awarded a contract to sell his fudge in Hershey's first Super Store in Niagara Falls, Canada. (*Id.* at 35:18-22.) In its Super Store, Hershey was selling 4,000 pounds of fudge per week. (*Id.* at 35:23-25.) According to Warman's calculations, he has sold at least seven million pounds of fudge since he created the trade secret fudge recipe in 1989. (*Id.* at 25:22-26:22.)

Based on Warman's testimony about fudge sales and distribution, Plaintiffs argue that the commercial success of Warman's trade secret fudge recipe constitutes evidence of independent economic value. They argue that a jury could reasonably conclude—and in this case did conclude—that the recipe gave Warman's businesses a competitive advantage.

At the same time, Defendants elicited testimony from Warman at trial regarding the failure of many of his businesses. According to Defendants, none of the businesses that sold fudge did so profitably. In 2000, Christopher M's filed for bankruptcy. (ECF No. 439 Ex. A at 37.) After the bankruptcy, Warman went through another business, Big Daddy Chocolate Shop, and then in 2003, began using the Fudgie Wudgie brand. (*Id.* at 41-42.) After additional difficulties, Warman filed for personal bankruptcy in 2007. (*Id.* at 119.) Defendants note that despite Warman's unsubstantiated claim that the company made $1 million in 2008, the year it started in business, that company also failed, amassing significant debts, at one point exceeding $3 million and going out of business in 2011. (*Id.*)[8]

Warman also claimed that he "could have" sold $100 million worth of product if various

---

[7] Defendants contend that Warman was lying because he was selling chocolate, not fudge, on this program. (ECF No. 471 at 3.) They support this assertion by citing to a hyperlink of a video clip of the program. However, this evidence was not presented to the jury during the trial.
[8] Plaintiff Moonshine LLC was using the recipe to make and sell fudge as of the trial date.

problems had not arisen. (*Id.* at 146-47.) He admitted having mold problems with fudge he manufactured for Hershey.[9] In order to stay in business, he perpetually needed more money and was unable to pay his taxes (*id.* at 151; Ex. C); was required to bring in outside investors (Ex. A at 156-57; Ex. D); and created a preferred class of stock to infuse cash into his businesses. He had to borrow additional money from the preferred stockholder and give up additional stock in the company (Ex. E) and was unable to pay the preferred stockholder the dividend he had agreed to pay (Ex. A at 176-77). And despite Warman's claim at trial that he had "wild success" supplying Costco Wholesale, Sam's Club, and Walmart (Ex A at 37-38), the company's Sam's Club and Walmart operations had to be phased out because they were not performing financially. (Ex. I.)[10]

Based on the evidence presented at trial, it cannot be reasonably disputed that many of Warman's companies in the business of making and selling fudge experienced financial difficulties, or that the fudge provided to Hershey had quality issues. Whether this reflects the value of the trade secret is a different matter, however. The fact that Warman made poor business decisions (ECF No. 462 Ex. 1 at 39-41), that his businesses were not profitable or even that he may not be adept in financial matters does not conclusively show that the fudge recipe lacked

---

[9] Warman was forced to take back 500,000 pounds of fudge and, according to him, this resulted in millions of dollars in losses. (Ex. A at 49; Ex. B at 65.) However, the cancellation of the parties' contract by Hershey after one of Warman's companies delivered a batch of moldy fudge does not conclusively prove that the recipe lacked independent economic value, particularly when the only testimony offered about this issue was Warman's and he represented that the mold came from the box manufacturer. (ECF No. 462 Ex. 1 at 48:14-49:23, 50:8-20.) No one called a representative of Hershey as a witness at trial.

[10] Defendants also point out that Warman claimed without any corroborating evidence that his fudge was the "best in the world," and it tasted better than "any other fudge in the world." (ECF No. 439 Ex. A at 11.) He also testified that the fudge made by other companies was "inedible." (ECF No. 441 Ex. B at 44.) Plaintiffs did not rely on these admittedly self-serving statements to establish the recipe's independent economic value, however. Defendants speculate, without any record evidence, that "Millions of people purchase fudge *with* a doctoring agent, suggesting that consumers like the taste of fudge with doctoring agents better than fudge without it." (ECF No. 437 at 9.)

independent economic value. Despite his business failings, he has sold, by his account, millions of pounds of fudge using his recipe. Thus, there was sufficient evidence from which a jury could conclude that the recipe had economic value to Plaintiffs.

The sales volume of Plaintiffs' fudge also provides evidentiary support that Defendants could gain economic value by accessing and using the recipe. This evidence suggests that if the recipe was acquired and used by Defendants, it could improve their ability to sell fudge or compete with Warman. Thus, because Defendants could obtain economic value from the use of the recipe, a reasonable jury could conclude that the recipe derives independent economic value from not being generally known. *See Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655, 663 (4th Cir. 1993). In fact, as reflected in the record, for a period of time until mid-2019, Falvo had a license to produce fudge using the trade secret formula. *See* ECF 290, Ex. 2 ("my wife is no longer authorized to produce fudge using my formula"); Ex. 4 (reference to revoking Falvo's license to use the trade secret recipe for fudge).

It next becomes necessary to determine whether, based on the evidence presented, a jury could reasonably conclude that Plaintiffs took sufficient measures to keep the recipe secret. See *Oakwood Labs.*, 999 F.3d at 913 ("The trade secret's economic value depreciates or is eliminated altogether upon its loss of secrecy"); *Synopsys,* 70 F. 4th at 771 ("not everything with commercial value constitutes a trade secret"); *Strombeck v. New Line Cinema,* 384 F.3d 283, 305 (6th Cir. 2004) (a trade secret derives value from its secrecy).

As reflected in the evidence presented at trial, there are any number of fudge recipes generally available, but Warman testified that his recipe was unique and unlike any other. In their case in chief, Plaintiffs introduced at trial and presented testimony regarding a document developed by Warman entitled: "Formulation Information Trade Secret Hand Made Fudge

Formula" dated August 20, 2013. The document states on its cover page: "Confidential-Do not Reproduce." (See ECF No. 290, Ex. 1.) It includes information about the elements of the trade secret and states, among other things:

> No utilization of [the trade secret fudge formulation] is authorized without the express written consent of Christopher M. Warman…All information concerning ingredients, processing of, and production of fudge products utilizing the [trade secret formulation], whether by oral or written communication or by observation, shall be treated and regarded as confidential, proprietary and trade secret information…Authorized recipients of this [trade secret formulation] shall keep it strictly confidential and secret…

*Id.* at 2.

Plaintiffs also introduced four separate confidentiality agreements between certain of Warman's companies and employees at various times between 2018 and 2021. Each agreement references trade secrets, including recipes and formulas, and includes the employee's agreement not to use or disclose trade secrets, and other confidential information. (*Id.* Exs. 10-13.) Also admitted into evidence was an undated and unsigned letter to Falvo in which Warman demanded that she stop using the "Trade Secret recipe for fudge" and stated that he had done "everything in [his] power to keep the fudge recipe a Trade Secret," including (1) only licensing its use to those necessary to make fudge under his or family member supervision; (2) keeping the only copy of the trade secret in a secure place; (3) making sure that anyone who needed access to it agreed to keep it confidential and not use it; and (4) enforcing it against third parties. (*Id.* Ex. 4.)

Thus, Plaintiffs provided sufficient evidence to the jury that they took reasonable steps to protect the secrecy of the fudge recipe.

While it is not dispositive on this issue, some of the same issues were addressed in *Christopher M's Hand Poured Fudge, Inc. v. Hennon*, 699 A.2d 1272 (Pa. Super. 1997), *appeal denied*, 717 A.2d 1026 (Pa. 1998). Warman's former company, Christopher M's, sued a former

employee, Clyde Hennon, for misappropriating the same fudge recipe at issue in this case. The Court of Common Pleas issued a permanent injunction and, on appeal, the Pennsylvania Superior Court affirmed the decision, noting that:

> At the hearing, Warman testified that he derived Christopher M's recipe after several years of trial and error from a recipe that he had purchased for $140,000 from a New England candy maker. Warman stated that certain aspects of Christopher M's recipe were unique and not utilized by other fudge manufacturers …Further, Warman testified that he took great care to keep the recipe secret. The precautions that he followed included: keeping only one written copy of the recipe and storing it off the premises of his business; compartmentalizing the manufacturing process, so that most employees would know only the portion of the recipe relating to their specific manufacturing tasks; and revealing the entire recipe to very few key employees. Finally, Warman testified that the recipe had a multimillion-dollar value.
>
> We conclude that Warman's testimony is sufficient to establish that the recipe is a trade secret. Before Hennon left the company, the recipe was not known outside of Christopher M's; Warman expended a large sum of money and a great deal of effort in developing the recipe; Warman took steps to keep the recipe a secret within the company; and Warman testified that the recipe was valuable. This evidence is sufficient to establish that the recipe is a trade secret.

*Id.* at 1275 (record citations omitted).[11]

Thus, Defendants have failed to demonstrate that the record is "critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." As the Court of Appeals has noted, "The test is a stringent one because a Rule 50(b) motion implicates the right to a trial by jury embodied in the Seventh Amendment." *Watcher v. Pottsville Area Emergency Med. Servs., Inc.*, 248 F. App'x 272, 280 (3d Cir. 2007). Therefore, the motion judgment as a matter of law will be denied.

---

[11] The Court recognizes that his decision was based on a record developed in conjunction with an injunction. Nonetheless, it provides some evidence that Warman developed a recipe and sought to keep his recipe a secret.

## IV. Conclusion

For the reasons set forth herein, Defendants' Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b) for Plaintiffs' Failure to Prove That the Alleged Trade Secret Fudge Recipe Had Independent Economic Value by Reason of Its Being Kept Secret (ECF No. 436) will be denied.

An appropriate order will follow.

April 22, 2025                                        BY THE COURT:

                                                          s/Patricia L. Dodge
                                                          PATRICIA L. DODGE
                                                          UNITED STATES MAGISTRATE JUDGE